IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY CORPORAL,

   Plaintiff,

   v.

SECURITY CHIEF BUTLER,
LT. J. SMITH,
COMMISSIONER HILL,
WARDEN WEBER,

   Defendants.

Civil Action No.: DKC-19-3490

## MEMORANDUM OPINION

Presently pending and ready for resolution in this civil rights action is the motion to dismiss or for summary judgment filed by Secretary of the Department of Public Safety and Correctional Services Robert L. Green, former Commissioner of Correction O. Wayne Hill, Acting Warden Ronald S. Weber, Acting Assistant Warden Bradley O. Butler, and Lt. James J. Smith[1]. ECF No. 19. Mr. Corporal opposes the motion. ECF No. 23. Additionally, Mr. Corporal filed motions to withdraw a motion for extension of time and for production of documents. ECF Nos. 24 & 25. A hearing to determine the matters pending before the court is not necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, Defendants' motion, construed as one for summary judgment, shall be granted.

### I. BACKGROUND

**A.**   **Complaint Allegations**

In his amended complaint, Mr. Corporal alleges that on July 26, 2019, after he refused to be housed with a cellmate, Defendant Security Chief Butler approved a recommendation made by

---

[1] The docket does not reflect that Secretary Green is a defendant. This is an oversight, as pointed out by Defendants. Secretary Green was named in the amended complaint. The clerk will be directed to correct the error.

Defendant Lt. J. Smith that Mr. Corporal should be confined in a "temporary isolation cell." ECF No. 11 at 2. Mr. Corporal was held in this cell (4B-02) for ten days. *Id*. He asserts that there was a light on in the cell that nobody could turn off and that he was denied all of his property with the exception of a pair of socks, a t-shirt, and boxer shorts. *Id*. at 3. He also claims that he was denied sheets, a blanket, shoes, slippers, clean clothes, a towel and washcloth, and out-of-cell recreation. *Id*. Mr. Corporal states that he was denied a shower except for on the seventh day he was confined in the cell. *Id*. Additionally, he was denied eating utensils, medical sick call forms, grievance forms, cleaning supplies, and access to outgoing and incoming mail. *Id*. Mr. Corporal states that the noted deprivations meant that he had to use his "increasingly unsanitary hands to eat my meals" and that he was made to "endure cold temperatures nightly." ECF No. 11 at 3.

Mr. Corporal claims that the conditions under which he was confined for ten days caused him to suffer: stress, depression, anxiety, and PTSD; sore feet, knees, calves, and ankles from walking on the floor; a rash under his arms as well as itchy skin from not showering; fever; toothache; sore and irritable gums from not flossing his teeth; stained teeth from not brushing his teeth; sore eyes and constant headaches from sleep deprivation caused by the cell's light being on continuously; and a sore throat and constant cough "from enduring cold temperatures nightly." ECF No. 11 at 4.

According to Mr. Corporal, the conditions complained of here were similar to the conditions at issue in an Inmate Grievance Office ("IGO") complaint he filed in 2010. ECF No. 11 at 4. He states that in *Corporal v. D.O.C.*, IGO Case No. 2010-17-78, he argued that his confinement in a "temporary isolation cell in housing unit 4" for a period of four days without hygiene products, violated the Division of Correction's policy (110-4) and WCI's institutional directive 110-4-1 and the IGO ruled in his favor. *Id*. at 5. The Secretary of Public Safety and

Correctional Services ordered officials at WCI to conduct a review of the use of the isolation cell in housing unit 4 at WCI as a result of Mr. Corporal's grievance. *Id*.

As relief, Mr. Corporal seeks 20 million dollars in compensatory damages, five-thousand dollars in punitive damages, and fifty dollars in nominal damages. ECF No. 11 at 2.

**B.**     **Defendants' Response**

The following facts are supported by Defendants' motion. On July 26, 2019, Mr. Corporal received an infraction for violating Rules 316 (disobeying an order) and 402 (being in an unauthorized location) in connection with his refusal to accept a new cell assignment. ECF No. 19-5 at 1 (Notice of Inmate Rule Violation). The infraction notice was written by Sgt. J. Bennett who was assigned to Housing Unit 4 (HU 4) as the Officer in Charge ("OIC"). *Id*. Sgt. Bennett wrote in the infraction that when Mr. Corporal was told to pack all of his belongings because he was being moved to HU 5, Mr. Corporal stated that he was refusing to move. *Id*. After warning Mr. Corporal that his refusal would result in an infraction and giving Mr. Corporal a direct order to pack his belongings, Sgt. Bennett removed Mr. Corporal from his cell and escorted him to cell 4A-25A. Mr. Corporal refused to move into that cell. *Id*. Sgt. Bennett then escorted Mr. Corporal to cell 4B-2 "for monitoring of behavior and compliance with staff." *Id*. Mr. Corporal refused to move to another cell because he did not want to be housed with another inmate. ECF No. 19-7 at 2.

On July 29, 2019, Mr. Corporal was assessed by Karen Brown, RN, for "seg placement suicide risk." ECF No. 19-14 at 2-3. Ms. Brown noted that Mr. Corporal had refused to be assessed and refused to sign a Release of Responsibility ("ROR") form. *Id*. at 3. She educated Mr. Corporal on weekly mental health rounds in the segregation unit, as well as other matters such as how to access mental health by sick call slip and suicide prevention. *Id*.

On July 31, 2019, Lt. J. Smith who was the Special Confinement Unit Manager, sent a notice to the Chief of Security indicating that he had attempted to remove Mr. Corporal from "Staff Alert Status" but Mr. Corporal was "still non-compliant with accepting a housing assignment with anybody." ECF No. 19-7 at 1. Lt. Smith noted that Mr. Corporal had refused a shower and "a vitals check" and that he redesignated Mr. Corporal to "Staff Alert" until he complied with staff to accept housing. *Id*. Chief of Security Lt. Butler approved the assignment to Staff Alert. *Id*.

The Staff Alert designation is "a temporary designation to alert staff of inmates who pose a substantial threat to the security and order of the institution, or who threaten harm to staff or other inmates and are in need of special handling practices." ECF No. 19-8 at 1-2 (Directive No. WCI.110.0006.1.04.B(2)). Once an inmate is placed on Staff Alert, if an officer "believes the inmate's behavior during the past 24-hour period justifies it, the Officer may recommend, in writing to the Supervisor at any time, that the inmate's Staff/Behavioral Alert Designation be evaluated for removal or for the inmate to remain on staff alert." *Id*. at 7. Inmates placed on Staff Alert are to "remain on Staff/Behavioral Alert Designation only for the amount of time necessary to modify their behavior." *Id.* There are specific requirements for receiving showers, recreation time, and possessing property.

Showers are provided in accordance with HU 4 policy. ECF No. 19-8 at 9. Additionally, inmates are escorted to the shower in restraints and must be re-cuffed in front of their bodies during the shower. *Id*. After the shower is completed, the inmate is provided with the jumpsuit worn during the escort to the shower and, after he puts on the jumpsuit, he is restrained behind his back once again. *Id*.

Recreation is provided when the inmate's behavior warrants it. ECF No. 19-8 at 9. Staff Alert inmates are escorted to the "recreation cage" in full restraints and must remain restrained

4

during recreation. *Id*. The inmate's handcuffs may be moved to the front for recreation, but the leg irons must remain in place. *Id*.

When an inmate is assigned to Staff Alert, all of his property is removed, inventoried, and stored in the HU 4 Property Room. ECF No. 19-8 at 9. Property is then given back to the inmate "according to the inmate's behavior." *Id*. Hygiene items are "provided as needed" and the inmate "will be placed in a jumpsuit and issued a mattress, unless those items are deemed to be a threat to the security of the inmate's housing area." *Id.*

Mr. Corporal's Staff Alert status was reviewed every day from July 27 through August 5, 2019. ECF No. 19-9. Each day until August 5th, it was noted that Mr. Corporal continued to refuse to share a cell with anyone. *Id*. at 2-10. On August 5, 2019, it was recommended that Mr. Corporal be removed from Staff Alert Status because he was then compliant with accepting a housing assignment. ECF No. 19-9 at 1. This is also the date of Mr. Corporal's adjustment hearing for his July 27, 2019 infraction. Mr. Corporal refused to attend the adjustment hearing and instead entered a guilty plea to the charges. ECF No. 19-5 at 4, 7-8. As a penalty, Mr. Corporal was given 15 days of segregation. *Id*. He was then escorted to an assigned cell in segregation with his allowable property. ECF No. 19-9 at 1.

Mr. Corporal also submitted an Administrative Remedy Procedure (ARP) request on August 5, 2019 (WCI 1340-19), concerning his assignment to "4B-02 for ten days." ECF No. 19-16 at 1. In his ARP, Mr. Corporal complained that the light in his cell stayed on continuously ("I couldn't turn it off") and that he did not undergo a mental health evaluation. *Id*. He complained that "all furnishings" had been removed from the cell where he was placed and the only clothing that he was allowed was a pair of socks, boxers, and a t-shirt. *Id*. at 3. He was denied sheets and

blankets which made him "cold at night"[2] and he was not provided with slippers or shoes, forcing him to walk and stand on the hard concrete floor. *Id*. He also claimed that he was denied: clean clothes, showers (except the seventh day), sanitation supplies, eating utensils, access to the mail, access to ARPs, access to the courts, access to his Bible, access to the Chaplain, and access to medical sick call slips. *Id*. He asserted that the conditions under which he was confined for 10 days caused him to suffer PTSD with frequent nightmares; depression and anxiety; sore feet, calves and knees; itchy, burning feet and toes from not using foot medicine; sore and irritable gums from not flossing his teeth; sore throat and constant coughing from the "cold temperatures" he endured at night; a rash on his right underarm from the lack of showers; sleep deprivation due to the lighting; and stained teeth because he could not brush them. *Id*. He claims that when he was removed from the cell he "experienced an immediate daze for a few hours during which [he] experienced difficulty functioning properly." *Id*. He asked for monetary damages for the asserted violations of his constitutional rights. *Id*.

The response to Mr. Corporal's ARP, dated August 28, 2019, indicates that Mr. Corporal was "continuously asked to comply with a new housing assignment" during the time he was assigned to Staff Alert. ECF No. 19-16 at 2. Mr. Corporal refused. *Id*. The response also indicates that Mr. Corporal received basic clothing and food while housed in the 4B-2 cell and that no staff working in the area received any complaints from Mr. Corporal regarding medical or psychological issues he needed to have addressed. *Id*. The investigation notes indicate that the

---

[2] These events took place in the middle of the summer. The temperatures at night during the period of July 26 through August 5, 2019, in Cumberland, Maryland, never fell below 60 degrees and daytime temperatures ranged from the low 80s to 90 degrees. *See* https://www.timeanddate.com/weather/usa/cumberland/historic?month=7&year=2019 (last visited Nov. 23, 2020). The court may take judicial notice of such facts. Pursuant to Fed. R. Evid. 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

ARP was investigated by Lt. Smith who submitted a "Matter of Record" stating that Mr. Corporal "received all three meals daily and never was his cell light left on continuously as he falsely claims." ECF No. 19-16 at 4. Lt. Smith further notes that Mr. Corporal was offered a "vitals check" by medical staff "several times" and a shower, "but he always refused." *Id*. The investigation also notes that "Mrs. Gordon (Psychology) was at training when Corporal was removed from Staff Alert Status and upon her return to work, she met with Corporal." *Id*. at 5. Mr. Corporal appealed the dismissal of his ARP to the Commissioner of Correction, who affirmed the dismissal on September 16, 2019. *Id*. at 13.[3]

On August 15, 2019, Mr. Corporal was seen by a therapist, Melanie S. Gordon, for individual therapy. ECF No. 19-14 at 10. Ms. Gordon "[m]et with [Mr.] Corporal in response to a written self-request and a medical referral in which [he] complained of being 'depressed.'" *Id*. Ms. Gordon interviewed Mr. Corporal and noted that:

> [Mr. Corporal] stated that he was held in cell B2 (contingency cell for observation/staff alert) for 10 days and as a result "became depressed." When asked why he was held in B2, he stated "because I was being an ass." He admitted that he wants to return to a single/handicapped cell and when he learned he was not going to be, he refused to leave the building. When therapist pointed out that he was not handicapped, he smiled and said, "well I want to be by myself."
>
> When questioned further about his feelings of depression, he could not elaborate on his symptoms of "nightmares." He responded with "what are you going to prescribe me?" Therapist explained that a psychiatrist prescribes medication and therapist was there for psychotherapy. Therapist also explained the difference between clinical and situational depression. When [Mr. Corporal] seemed to not be getting the answers he wanted, he asked "are you done now?" Therapist explained that he requested the session and he stood up and said "I'm done then."

ECF No. 19-14 at 10.

---

[3] Mr. Corporal also filed an appeal with the Inmate Grievance Office and, in a letter dated November 12, 2019, it was dismissed as "wholly lacking in merit." ECF No. 19-17 at 3.

**C.     Plaintiff's Response**

Plaintiff's opposition takes the form of his own declaration, to which he attached a statement of disputed facts and two exhibits.  ECF No. 23.  He disputes the assertions that (1) cell 4-B-2 was not a temporary isolation cell, (2) the light did not stay on continuously, (3) he was given property permissible pursuant to policy WCI 110.0006.1, (4) he was given sheets, blankets, shoes, health and hygiene products, clean clothes, showers, out-of-cell recreation, grievance forms, sick call forms, sanitation supplies, access to the chaplain and nurses, (5) he failed to complain, (6) nurses attempted to check his vital signs, (7) he was offered daily opportunities to remove himself from the cell, and (8) he was not forced to endure cold temperatures nightly.  He reiterates, under penalty of perjury, that he suffered injuries.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002).  Importantly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "A party

opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" (*Id.*) (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

### III.  DISCUSSION

**A.     Eighth Amendment**

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 298-99. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th

Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly established pre-existing law. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Where an inmate was confined for six days in cells described as "shockingly unsanitary," the Supreme Court has held that the prison officials responsible for the inmate's confinement had fair warning that their specific acts were unconstitutional. *Taylor v. Riojas*, __ U.S. ___, 2020 WL 6385693, *1 (Nov. 2, 2020).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "a serious or significant physical or emotional injury resulting from the challenged conditions." *See Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 770).

At issue here is Mr. Corporal's temporary assignment to a cell stripped of all its contents, for a period of ten days. It is undisputed that the cell where Mr. Corporal was held was in the housing unit and he was not isolated from all human contact.[4] *See* ECF No. 19-4 at 2, ¶ 8 (describing Staff Alert cell as being on same housing unit wing as other cells and located near

---

[4] Mr. Corporal disputes that the cell he was placed in was not an "isolation cell." There is no dispute about the number/letter designation (4-B-2), but Plaintiff does dispute the label assigned to the cell. Defendants label the cell as one of two in the housing unit for "Staff Alert" status and they rely on the portion of WCI.110.0006.1 concerning "Staff Alert" status, while Plaintiff contends that the "isolation" cell is subject to WCI 110-4. He bases that assertion, in part, on a grievance he filed in 2010. Whatever the status of the cell in 2010, it appears to have no relevance to either the physical characteristics or the regulations applicable in 2019.

where staff are primarily located). Defendants assert that Mr. Corporal was asked on a daily basis whether he would accept the housing assignment given to him by prison officials and thereby earn his removal from Staff Alert status; which was documented on a daily basis. While Mr. Corporal denies being "offered daily opportunities to remove himself from the cell," he does not deny that he was removed from Staff Alert status after agreeing to accept a cell assignment. ECF No. 23 at 5. He also does not deny that he had contact with correctional officers while in the cell.

Mr. Corporal also claims that he was denied access to sick call slips, but he does not describe any medical complaint that required medical attention during the ten days he was confined on Staff Alert. ECF No. 23. Further, Mr. Corporal does not claim that he made any of the named Defendants aware of his need for medical care; rather, he simply complains that only life-threatening conditions were a concern and that he made unknown officers aware on unknown dates that he needed to submit a sick call slip. *Id*. at 4-5. He attaches as an exhibit an ARP he submitted on September 28, 2019, stating that he submitted a medical sick call form on September 23 for injuries sustained during his confinement to Staff Alert status. ECF No. 23-4. That ARP was found "meritorious in part" because he was not seen in a timely manner by medical staff; there is no indication that he raised legitimate medical concerns when medical staff saw him. Importantly, Mr. Corporal's claimed psychological injuries were not evident to the therapist who spoke with him shortly after his removal from that status. *See* ECF No. 19-14 at 10 (notes on therapy session). Mr. Corporal does not dispute the content of that report.

The assertion that Mr. Corporal makes regarding being forced to "endure cold temperatures nightly" while assigned to Staff Alert lacks any objective evidence to support it. The period of time Mr. Corporal was confined to Staff Alert encompassed the last week of July and part of the first week in August. This court takes judicial notice of the fact that temperatures during that time of year did not drop to a dangerously low level, subjecting Mr. Corporal to possible injury.

11

The parties dispute whether the light in Mr. Corporal's cell remained on twenty-four hours a day. Neither Mr. Corporal nor the Defendants have described how operation of the lights in the cells on HU 4 operate. However, Mr. Corporal's claim does not go beyond the allegation that the light remained on. Further, there is no evidence that Defendants were made aware of the light remaining on at all times and refused to remedy the situation. ECF No. 19-4 at 2, ¶ 5. There is also no evidence that Mr. Corporal suffered an injury caused by the light remaining on at all times beyond his assertion that his eyes were sore. *See* ECF No. 19-14 at 6 (Aug. 5, 2019 medical record describing Mr. Corporal as being in no apparent distress); 10 (Aug. 15, 2019 psychology record).

Mr. Corporal's claim that the Defendants' failure to provide him with blankets, sheets, shoes or slippers, and clothing beyond a t-shirt and boxer shorts, combined with the possibility that the light was left on, does not state an Eighth Amendment claim, particularly where there is no discernible injury resulting. Neither the subjective prong, nor the objective evidence of an injury required to establish an Eighth Amendment claim is supported by the record here. The temporary conditions of Mr. Corporal's confinement on Staff Alert may have been more harsh than his prior cell assignment, but those conditions do not amount to an Eighth Amendment violation to an unnecessary and wanton infliction of pain or harm. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). To the extent that Mr. Corporal disputes that the cell he was placed in was a contingency cell and not an isolation cell as he claims, the dispute is not material to the Eighth Amendment claim. In determining whether the challenged conditions amount to punishment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995). Defendants are entitled to summary judgment on this claim.

**B.     First Amendment**

    1.     Practice of Religion

Mr. Corporal's claim that he was denied an opportunity to practice his Christianity is based on the denial of access to his Bible and to the prison Chaplain. ECF No. 11; ECF No. 23. Prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). That retained right is not unfettered. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987). The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

Defendants assert that Mr. Corporal was denied access to his Bible because inmates assigned to Staff Alert are denied all items that could possibly be used to clog the toilet or otherwise to disrupt the orderly operation of the housing unit. ECF No. 19-4 at 2, ¶ 7. Defendants do not suggest, nor does the record support, that Mr. Corporal was in the habit of flooding the tier by deliberately causing the toilet to overflow. *Id.* However, absent from any of Mr. Corporal's papers is any description of a request made to any of these Defendants for access to his Bible or to speak with the Chaplain; or any explanation of how the lack of access to his Bible impacted his ability freely to practice his religion during his ten-day confinement on Staff Alert. *See id.* at ¶ 6. Mr. Corporal's blanket statement that deprivation of a religious text is *ipso facto* a deprivation of his First Amendment right freely to practice religion does not suffice to state a claim. Moreover, Mr.

13

Corporal "bears the burden of demonstrating an infringement of his religious beliefs," and "also of showing that [prison officials'] refusal to accommodate his [religious beliefs] is not rationally related to a legitimate penological interest." *Jehovah v. Clarke*, 798 F.3d 169, 180 (4th Cir. 2015), citing *Turner*, 482 U.S. at 89. He has failed to satisfy that burden, entitling Defendants to summary judgment in their favor.

    2.    <u>Access to Courts and Mail</u>

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399. In his claim regarding access to mail Mr. Corporal implies that his lack of access to incoming or outgoing mail impacted on his access to courts. ECF No. 11. However, Mr. Corporal does not specify *how* his lack of access to the mail for ten days adversely affected an

14

ongoing, nonfrivolous, and arguable claim. He cites to no missed deadlines or missed opportunities to participate in legal matters impacting on the validity of his conviction or challenging the conditions of his confinement. The claim is conclusory and must be dismissed.

## IV. Non-Dispositive Motions

Mr. Corporal filed two motions which remain pending. He filed a motion to withdraw motion for extension of time (ECF No. 24), explaining that he sought additional time in which to file his opposition because he had not received Defendants' motion, but he received it the following day. At the time Mr. Corporal sought to withdraw the motion for extension of time it had already been granted. *See* ECF Nos. 21 & 22. The motion to withdraw shall therefore be denied as moot.

The second motion filed by Mr. Corporal seeks an Order requiring Defendants to provide a copy of IGO Case No. 210 017 78 because it is a decision that reverses the one issued in IGO Case No. 201 010 58 which Defendants did provide. ECF No. 25. Mr. Corporal states he needs a copy of this decision in order to oppose the pending motion for summary judgment. *Id*. To the extent Mr. Corporal is seeking to conduct limited discovery, the pending motion is governed by Federal Rule of Civil Procedure 56(d) which provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1) Defer considering the motion or deny it;
> (2) Allow time to obtain affidavits or declarations or to take discovery; or
> (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications*

*& Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'"  *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011), *rvs'd on other grounds*, (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is denied properly "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008).

The IGO decision included with Defendants' exhibits was issued on November 19, 2010, and concerns Mr. Corporal's claim that a three-day confinement in what he claimed was an isolation cell, violated his constitutional rights.  ECF No. 19-18.  The Administrative Law Judge (ALJ) found that Mr. Corporal had not been confined to an isolation cell; rather, he was placed on Staff Alert in a contingency cell.  *Id*. at 6-7.  This was significant to the grievance because the regulation upon which Mr. Corporal relied, DCD 110-4, does not apply to contingency cells.  *Id*. at 6.  Testimony was provided at the hearing, which Mr. Corporal did not dispute, establishing that

"[t]he contingency cell is on a wing of Housing Unit 4, the segregation unit" and "[t]he isolation cells are elsewhere in the institution, in a central location, and are not on individual housing units." *Id.* at 7. The ALJ also noted that:

> The correctness of the placement of [Mr. Corporal] on Staff Alert is not an issue in this grievance. . . . Housing Unit 4 is the segregation unit at WCI. It houses inmates on D[isciplinary] S[egregation], administrative segregation, [and] P[rotective] C[ustody . . . . Inmates on the same type of segregation are housed together; this means that there are not as many options for the institution to change housing assignments.
>
> These points are significant because [Mr. Corporal's] behavior was disruptive and consumed staff time and resources in a unit where maintaining order is more challenging than in the general population. As argued by the DOC, [Mr. Corporal's] own actions placed him on Staff Alert and in the contingency cell, and the power to change that status rested with him.

ECF No. 19-18 at 8 (footnote omitted). The ALJ then concluded that depriving Mr. Corporal of a mattress and a bed for three days while he was in the contingency cell did not violate his rights to due process, his Eighth Amendment right to be free of cruel and unusual punishment, or applicable prison regulations. *Id.* at 8-14.

In his motion, Mr. Corporal maintains that there was a different IGO decision (case number 210 017 78) involving ARP WCI-0231-10. ECF No. 25 at 1. Also included with Defendants' motion is an index of ARP complaints filed by Mr. Corporal dating back to January 17, 2008. ECF No. 19-15. While none of the ARPs indexed have the case number Mr. Corporal references, there are three that concern his housing assignment, all of which are designated as "WCI-0000-10." ECF No. 19-15 at 1.[5] Nevertheless, to support a motion pursuant to Fed. R. Civ. P. 56(d), Mr. Corporal must come forward with more than a conclusory statement that he needs the IGO decision to oppose the summary judgment motion. He has failed to do so. Mr. Corporal does not explain how any reversal of a decision issued ten years ago and concerning the particular conditions that

---

[5] All grievances in the years before 2011 have the number "0000" in the index.

existed in the contingency cell at that time impacts on the claim asserted in the complaint now pending before this court.  Even if the conditions under which Mr. Corporal was confined ten years ago were found somehow to violate his rights, there has been no nexus drawn between that confinement and the one that occurred between July 26 and August 5, 2019.  The motion shall be denied.

## V.  CONCLUSION

Defendants' motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be granted by separate Order which follows.  Plaintiff's pending motions shall be denied.


December 7, 2020                                         /s/
                                               DEBORAH K. CHASANOW
                                               United States District Judge